Mr. Seymour Duncker
Debtor's Responsible Individual
E-mail: sduncker@gmail.com

April 14, 2020

**Via E-mail**

Honorable M. Elaine Hammond
c/o Ms. Anna Rosales (anna_rosales@canb.uscourts.gov)
United States Bankruptcy Court
Northern District of California
Temporary Mailing Address:
450 Golden Gate Ave., Mail Box 36099
San Francisco, CA 94102

Re: Objection to Applications for Compensation, Case No. 18-50958 MEH

Dear Judge Hammond:

I write to the Court, in my capacity as iCharts, Inc.'s former CEO and Responsible Individual and on behalf of my spouse and creditor, Ms. Valerie Duncker, to raise concerns regarding and object to the applications for compensation by the Trustee's counsel (Rincon Law) and accountant (Richard L. Pierotti) as excessive, in light of the dismal results achieved in this case and related adversary proceeding, and the Trustee's professionals' pattern of failing to discharge their duties by refusing to take actions to preserve and maximize the value of the estate, causing harm to the estate. The Court should therefore only approve the fees and costs requested commensurate with the results achieved.[1] We submit that the Court should disallow all fees and costs related to the Duncker preference action on or after May 3, 2019, when the Trustee's professionals were informed of substantial weaknesses in that case by Ms. Duncker's attorney, yet they persisted in prosecuting the action for another eight months, resulting in a substantial net negative return to the estate.[2]

---

[1] The bankruptcy court must ensure that attorneys who represent the debtor do so in the best interests of the bankruptcy estate. *In re Park-Helena Corp.*, 63 F.3d 877, 880 (9th Cir. 1995); *see also In re Stevens*, 407 B.R. 303, 305 (Bankr. N.D. Ill. 2009) (Even if no objections were made "the court has a fundamental obligation to review [fee] applications to ensure that the fees and expenses are reasonable and justified.").

Prior to its bankruptcy, iCharts sold business intelligence software based on proprietary source code and other IP developed by its engineering team. iCharts' product was primarily marketed and delivered using the iCharts' name brand through the domain name: www.icharts.net. The debtor's main assets consisted of its IP – software, source code, its recognized domain name, and other IP. After iCharts' bankruptcy filing, I made sure that the Trustee was aware of this IP by disclosing it on the debtor's schedules. On June 27, 2018, I went one step further and also notified Mr. Hjelmeset via e-mail that iCharts' domain name, worth at least $21,131, was imminently set to expire if a $25.53 renewal fee was not promptly paid. (E-mail and appraisal enclosed.)

Instead of paying the $25.53 domain renewal fee to preserve approximately $21,131 in value, the Trustee's counsel instead filed a preference action of questionable merit against my spouse, for amounts she was forced to advance to the debtor as part of a group of secured lenders in late 2017. It is my understanding from my wife's counsel that the preference action had clear weaknesses, which were apparent after limited analysis, including a highly contested issue of the debtor's solvency in early 2018, the fact that there was no presumption of insolvency and Ms. Duncker had provided substantial new value on the eve of the bankruptcy. Ms. Duncker's counsel, informed Mr. Kleiner of these weaknesses at the outset of the adversary via the enclosed detailed letter, and extended a settlement offer for $8,000. Instead of accepting the settlement and minimizing fees and costs on a weak preference action, the Trustee's professionals proceeded to incur over $14,000 in additional fees prosecuting the adversary proceeding. Nearly eight months later in January 2020, counsel for the Trustee finally agreed to dismiss the adversary proceeding for payment of $15,000. In effect, the Trustee's professionals spent more than an additional $14,000 to recover only $7,000 more, after being advised that the suit against Ms. Duncker had clear weaknesses, resulting in a negative return to the estate.[3]

Where, as here (as of May 3, 2019), it becomes reasonably obvious that litigation will harm the estate by costing more than it likely will benefit the estate (a net negative), counsel has a duty to abandon such litigation. *Matter of Taxman Clothing Co.*, 49 F.3d 310, 314-15 (7th Cir. 1995) (fiduciary duty placed Trustee's counsel under an obligation to his client, the debtor's estate, to abandon the preference suit once it became reasonably obvious that further litigation would cost more than it was likely to bring into the estate). "As soon as it became clear that the preference suit could not yield the estate a net gain, [Trustee's counsel] should have taken the necessary steps to drop it." *Id.* at 314. The Court should therefore reduce the Trustee's professionals' fees and costs by in an amount equal to $14,057.55, which are the additional amounts they incurred after it was or should have been reasonably obvious to the Trustee's

---

[2] Specifically, this would require disallowance of $11,205.55 of the fees and expenses requested by Rincon Law and $2,852 of the fees and expenses requested by Richard L. Pierotti.

[3] As part of the settlement of the adversary proceeding, the Trustee also agreed to sell the debtor's core asset – its source code – for $1,000.

professionals that the preference action would result in a net negative to the estate (*i.e.*, all fees and costs incurred after May 3, 2019). *Id.*, at 315 (reducing compensation of attorney for Chapter 11 trustee and requiring return of all fees beyond those incurred in the initial investigation of a preference action because the attorney pursued preference lawsuits even after it became reasonably obvious that further litigation would cost more than the recovery to the estate); In re Schneider, No. 06-50441-MM, 2008 WL 4447092, at *7–8 (Bankr. N.D. Cal. Sept. 26, 2008) (disallowing approximately $926k in fees sought by counsel to chapter 11 trustee where, among other things, counsel incurred excessive fees on matters involving debtor's spouse, adopting "a misguided strategy in matters involving Mrs. Schneider that resulted in unnecessary litigation and legal fees.").[4]

The excessive and unreasonable amount of requested fees and costs will harm the estate – because sales of the debtor's remaining assets would have to reach likely unattainable levels to reach creditors, the Trustee's professionals have acted in unreasonable ways. For example, since early March 2020, I have contacted the Trustee and his counsel to bid on the debtor's residual assets. To date, I have offered an initial bid of $3,000, *plus* payment of the Trustee's reasonable fees and expenses to minimize any burden on the estate. I believe that such bid is reasonable because it would be subject to other bids, and I understand that, currently, there are no other parties interested in the debtor's remaining assets. Furthermore, the debtor already disposed of its source code for $1,000 and allowed its domain name to expire (effectively abandoning $21,131 in value for no consideration), so those important assets would not be included in the proposed sale. When the Trustee's counsel raised the issue of costs of implementation, I offered to have my counsel take the lead in drafting the proposed documentation or to pay the Trustee's reasonable fees and expenses in seeking Court approval of the transaction. The Trustee's counsel, however, has inexplicably been reluctant to consider my bid, admonishing me for reaching out the Trustee directly (when it was not clear communication was effectively getting through) and informing my counsel that the Trustee is not running a "bazaar". At each juncture, the Trustee's professionals have arbitrarily raised the asking price for an initial bid on the

---

[4] *See also In re McLean Wine Co.*, 463 B.R. 838, 850–51 (Bankr. E.D. Mich.2011) (discussing In re Taxman and noting that "counsel for the trustee has a fiduciary duty to realistically weigh the maximum possible success of any litigation against the costs to be incurred pursuing the litigation"); *In re Eckert*, 414 B.R. 404, 414 (Bankr. N.D. Ill. 2009) (trustee's counsel only allowed approximately half of his requested interim fees, representing approximately one-half of amounts held in estate accounts, where "the Applicant's requested fees [were] so disproportionate to the funds recovered, and the allowance of all of those fees and expenses would more than exhaust all of the funds in the estate's account."); *In re Wolverine Proctor & Schwartz, LLC*, No. 06-10815-JNF, 2012 WL 3930360, at *7 (Bankr. D. Mass. Sept. 10, 2012) (reducing compensation for co-counsel to the Trustee by fifty percent in category for litigation which resulted in harm to the estate through a net negative return, in view of the poor results obtained, because the professionals "did not objectively and impartially evaluate the merits or the risk of loss to the estate in the [litigation]."), *aff'd in part sub nom. In re Wolverine, Proctor & Schwartz, LLC*, 527 B.R. 809 (D. Mass. 2015).

debtor's residual assets without providing any justification (from $20,000 on March 16 to $45,000 on April 13, demanding a response and wire deposit in about 48 hours, with no reason offered for the strict deadline).

      I believe the interests of the estate and its creditors would not be served by approving the Trustee's professionals' requested fees and expenses in full. The Court should consider that the Trustee's professionals: (i) allowed the iCharts' domain name to lapse (a $21,131 value lost, even after I reminded them to renew), (ii) unnecessarily incurred over $15,000 in fees and costs in prosecuting a weak preference action, (iii) sold the debtor's main asset– its source code – for $1,000, and (iv) now refuse to even consider my initial bid for the remaining assets, which I understand would set in motion a sale process and be subject to higher bids. I reiterate my bid to purchase all of the debtor's remaining assets in exchange for payment of $5,000, and, to the extent costs to an estate are an issue, have my personal counsel prepare a motion seeking approval of the transaction, as well as ancillary documents at my expense.

      In light of the above, the Court should disallow all fees incurred by the Trustee's professionals incurred in prosecuting the Duncker adversary proceeding on or after May 3, 2019, in the amount of approximately $14,057.55, and direct them to seriously consider my bid for the debtor's remaining assets, subject to higher bids and Bankruptcy Court approval. Disallowing such fees and costs should provide creditors with a real path to a meaningful recovery, including from the prospective sale of the debtor's remaining assets.

Respectfully submitted,

Seymour Duncker

Enclosures

# Enclosure 1

 Seymour Duncker <sduncker@gmail.com>

## RE: iCharts

**Fred Hjelmeset** <fhtrustee@gmail.com>  Wed, Jun 27, 2018 at 12:13 PM
To: Seymour Duncker <sduncker@gmail.com>
Cc: Ike Shulman <ike@ikeshulmanlaw.com>, "Gregg Kleiner Esq." <gkleiner@rinconlawllp.com>

Mr. Duncker,

Thank you for your quick response.

Regards,

**Fred Hjelmeset**

**Bankruptcy Trustee**

P.O. Box 4188

Mountain View, CA 94040

650-386-5634

fhtrustee@gmail.com

**From:** Seymour Duncker [mailto:sduncker@gmail.com]
**Sent:** Wednesday, June 27, 2018 12:05 PM
**To:** Fred Hjelmeset
**Cc:** Ike Shulman; Gregg Kleiner Esq.
**Subject:** Re: iCharts

Dear Mr. Hjelmeset,

iCharts doesn't own any current trademarks to my recollection. Attached please see the patent information. There are a number of office actions outstanding and upcoming patents are at risk of getting abandoned. You can talk to the lawyer (Colby Springer at Polsinelli) taking care of the patents if you need to.

The Domain name icharts.net is hosted by GoDaddy and paid through 11/25/18. The website is hosted by Digital Oceans and requires a monthly payment of $25.53. The next required payment is coming up in three days. I can provide you with the login details to both services if you want. The website as you probably know is independent from the actual service

==(which is hosted by Google). So to keep up only the website you would need to take care of the Digital Oceans fee and GoDaddy if necessary.==

Pls note that I will be back traveling and only intermittently accessible for the next 10 days.

Best,
Seymour Duncker

On Wed, Jun 27, 2018 at 10:28 AM Fred Hjelmeset <fhtrustee@gmail.com> wrote:

> Dear Mr. Duncker,
>
> - Does iCharts own any trademarks?
> - Could you please send me documentation for the patents held by iCharts?
> - I am considering marketing the website, so I need to ensure it stays up. Has the hosting server been paid? If so, through which date? Is there anything else that needs to be done to keep the website up and operating?
>
> Thank you for your help.
>
> Regards,
>
> **Fred Hjelmeset**
>
> **Bankruptcy Trustee**
>
> P.O. Box 4188
>
> Mountain View, CA 94040
>
> 650-386-5634
>
> fhtrustee@gmail.com
>
>
> **From:** Seymour Duncker [mailto:sduncker@gmail.com]
> **Sent:** Monday, June 11, 2018 12:39 PM
> **To:** Fred Hjelmeset
> **Cc:** Ike Shulman
> **Subject:** Re: iCharts - Account Statements
>
> Dear Mr. Hjelmeset,

# Enclosure 2



# Free Valuator.com

## Appraisal Certificate
APPRAISED MARKET VALUE AS OF 14TH OF APRIL 2020

## Domain: icharts.net
## Value: $ 21,131.27 USD

THE VALUE OF THIS APPRAISAL REFLECTS FREEVALUATOR'S ESTIMATE VALUE ON THE ISSUED DATE OF THIS APPRAISAL. THE FREEVALUATOR VALUE IS BASED ON WEBSITE RANKS, ADVERTISER INTEREST, DOMAIN SALES AND OTHER VARIABLES. FREEVALUATOR IS NOT RESPONSIBLE FOR ANY CIRCUMSTANCES THAT MAY AFFECT THE VALUE OF THIS DOMAIN.

I certify that all information provided in this appraisal certificate is accurate to the best of my knowledge

*Ruud Feltkamp*
PRESIDENT

*Pim Feltkamp*
APPRAISAL SPECIALIST



# Enclosure 3



Jose Raul Alcantar Villagran
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, CA 94111

(t) 415 762 3100 | (f) 415 534 3200
raul@njfirm.com | www.njfirm.com

May 3, 2019

**FRE 408 CONFIDENTIAL SETTLEMENT COMMUNICATION**

**VIA E-MAIL**

Gregg S. Kleiner, Esq.
Rincon Law LLP
200 California Street, Suite 400
San Francisco, CA 94111

      Re: *Hjelmeset v. Duncker*, Adversary Proceeding No. 19-05011

Dear Mr. Kleiner:

      As you know, we represent Ms. Valerie Duncker, the Defendant, in the above-referenced adversary proceeding pending in the Bankruptcy Court for the Northern District of California (the "Adversary Proceeding"). Thank you for your communication of April 25, 2019, in which you provided an Excel workbook setting forth the Debtor's (iCharts, Inc.'s) alleged insolvency, on a balance sheet basis, during the second quarter of 2016 and in July and August 2017.[1]

      The Complaint alleges that Ms. Duncker advanced loan proceeds of $50,000 to the Debtor on or about November 9, 2017 (the "Funding Date"), pursuant to a loan and security agreement entered on or about October 25, 2017. It also alleges that financing statements were filed and recorded with the California Secretary of State and the Delaware Department of State on or about January 4, 2018 and January 12, 2018, respectively (the "Financing Statements"). It further alleges that Ms. Duncker received payment from the Debtor on the loan on or about February 1, 2018 ( "Loan Payment").

---

[1] The communication inaccurately states that my client and others lent funds to the Debtor on *August 31, 2017*. The communication also notes that the Debtor was unprofitable from the end of 2016 through August 31, 2017, and that certain "financial projections that include periods after August 31, 2017 and the projections show additional losses and cash burn." However, lack of profitability is only tenuously relevant to a solvency analysis at best, and does not mean that a business is insolvent. In fact, many SaaS businesses in Silicon Valley remain unprofitable well into a significant maturity (*e.g.*, Salesforce was still unprofitable in 2017, at $6B annual recurring revenue). In 2016, the Debtor raised approximately $7M on a valuation of approximately $50M with a plan to grow the business, the expectation for the business was to be unprofitable in return for growth. The deferred revenue position actually grew from $393,208 in Q1 2016 to $1,017,857 in Q2 2017, demonstrating the plan was being achieved.

We understand the balance sheet solvency analysis provided on April 25, 2019 is the basis for the Trustee's belief that the Debtor's insolvency can be established with respect to the alleged claims for avoidance and recovery of the Financing Statements and the Loan Payment under 11. U.S.C. section 547.[2] However, after careful review and consideration of the information provided, my client respectfully objects to the Trustee's contention that that the Debtor was insolvent during the periods pertinent to the Financing Statements and the Loan Payment, resulting from an improper balance sheet analysis that did not take into account the Debtor's going concern as a business and was not conducted pursuant to SaaS industry principles.

First, the April 25 solvency analysis does not take into account that the Debtor was a "going concern" and not on the verge of liquidating as of the summer of 2017 and well into the first quarter of 2018, with ongoing goodwill, and multiple exit as well as potential equity financing options available.[3] For example,

- in August 2017, an equity financing term sheet of $2 million was presented by the lead investor of the Debtor's prior equity financing round, but the term sheet failed to gain approval by the Debtor;

---

[2] As you know, under section 547(e)(2)(B), the Financings, which were recorded 30 days after the Funding Date, but **before** the Petition Date, would be deemed made at the time they were perfected – January 4, 2018 (California) and January 12, 2018 (Delaware), respectively – **not** immediately prior to the Petition Date, as the Complaint states. *See*, *e.g.*, *In re Ehring*, 900 F.2d 184, 187–88 ("Section 547(e)(2) states that there is a transfer made '(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 10 days after, such time,' or '(B) at the time such transfer is perfected, if such transfer is perfected after such 10 days,' or (C) just before the filing of the petition, if neither (A) or (B) is satisfied.") (9th Cir. 1990). Because the dates of recordation and perfection of the Financing Statements, January 4, 2018 and January 12, 2018, are well beyond the 90-day period preceding the Debtor's Petition Date (April 30, 2018), section 547(f)'s presumption of insolvency would not apply:

> The debtors are presumed to have been insolvent for the ninety days preceding the filing of their bankruptcy petition. The Code's presumption of insolvency, however, does not help the trustee in this case because the two transfers now alleged to be preferences occurred more than ninety days before the Debtors filed their bankruptcy petition with this Court. . . .

*In re Cochard*, 157 B.R. 449, 451 (Bankr. E.D. Mo. 1993) (internal citations omitted).

[3] *In re DAK Indus., Inc.*, 170 F.3d 1197 (9th Cir. 1999) ("[u]nder two-step process used in determining whether corporate debtor was insolvent during preference period, court must first determine whether debtor was a 'going concern' or was 'on its deathbed'[.]")

- in November 2017, Oracle expressed interest to acquire the Debtor and performed a six-week due diligence process;

- in January 2018, after paying outstanding invoices of approximately $675,000, Sears Home & Outlet considered awarding the Debtor an add-on contract of greater than $500,000 which would have paved the way to the Debtor's profitability;

- on January 25, 2018 certain lenders and the Debtor's major institutional shareholder negotiated a $2 million add-on equity financing, but failed to come to an agreement;

- in February 2018, an institutional investor provided a term sheet to acquire the assets of the Debtor (which the shareholders failed to approve);

- in March 2018, Sage Inc, a key competitor to Oracle, performed due diligence on the business to see if they wanted to acquire the business, but the transaction did not materialize; and

- in April 2018 an external investor provided a term sheet to acquire the assets of the Debtor (which the shareholders failed to approve);

Further the Debtor always paid its operating expenses, including 100% of its employees and contractors, through March 2018. The Debtor's officers and professionals would testify that the Debtor was a going concern through at least January 2018, and that Bankruptcy was only filed in April 2018 primarily due to deadlock amongst the Debtor's stockholders and lender constituencies in February and March 2018, which did not permit the Debtor to avail itself of potential financings and transactions on the table.

Second, the April 25 balance sheet analysis did not properly analyze the Debtor's balance sheet because (a) does not include any ongoing good will, even though the Debtor remained a going concern well into 2018, and (b) it did not properly account for "deferred revenue" in the context of an SaaS business such as iCharts. *See Diamond v. Osborne*, 102 F. App'x 544, 548 (9th Cir. 2004) (after determining the proper valuation standard, "the court must value the debtor's assets, depending on the status determined in the first part of the inquiry, and apply a simple balance sheet test to determine whether the debtor was solvent.").

In its SaaS businesses with a full prepay, the Debtor generally entered customer contracts that covered the full term of the service on a full prepay basis. The Debtor recorded cash receipts as "deferred revenue" in accordance with applicable standards and industry best-practices,[4] and recognized every

---

[4] New revenue recognition standards clarify best practice standards and prescribe amongst others how SaaS business should recognize revenue.
(https://www.fasb.org/jsp/FASB/FASBContent_C/CompletedProjectPage&cid=1175805486538).
Specifically, the new revenue recognition standard eliminates the transaction- and industry-specific revenue recognition guidance under current GAAP and replaces it with a principle-based approach for determining revenue recognition. To recognize revenue, the following conditions have to be met:

month a portion of the deferred revenue as revenue for that month, decreasing the corresponding deferred revenue position. (*E.g.*, for a $120,000 two-year contract, the deferred revenue position on the first month of the contract would be $120,000, on the second month $115,000, with $5,000 being recognized as revenue). Thus, while "deferred revenue" is listed under liabilities, it did not represent actual money that the Debtor would have to pay back to the customer. Instead, it represented money the Debtor would earn pursuant to a contract, and an increase in "Deferred Revenue" on the Debtor's balance sheet was in fact regarded as a very positive business development evidencing the business' going concern.[5]

Thus, in addition to accounting for the Debtor's good will, the April 25 balance sheet test at minimum would need to be adjusted to properly account for Deferred Revenue, as follows: "Current Assets - (Current Liabilities - Deferred Revenue + Projected Cost to Operate Service for an ongoing period)." For the Debtor in August 2017, the balance sheet test calculates as follows: **$766,749 (Current Assets) - ($1,211,081 (Current Liabilities) - $977,261 (Deferred Revenue) + $60,000 (Cost of operating service for 1 year)) = $472,929.** Even after this number is reduced by total long-term liabilities noted on the worksheet ($102,137), the Debtor remains solvent. Thus, pursuant to a balance sheet analysis in accordance to SaaS industry standards, and even without taking any good will into account, the Debtor was solvent in August 2017, and continued to operate as a, solvent, going concern with bona fide business prospects and always satisfying its debts as they came due well into 2018. Further, upon receiving the Loan Payment, Ms. Duncker used those proceeds to fund and satisfy certain of the Debtor's obligations – she did personally retain them for her benefit.

In light of the foregoing, and in order to avoid costly litigation and preserve the Bankruptcy Court's and the parties' resources, Ms. Duncker offers to pay the Trustee the sum of $6,000, minus Ms. Duncker's fees and costs incurred to date, in exchange for the Trustee's dismissal of the entire Adversary Proceeding

---

- The customer has the contractual right to take possession of the software at any time during the hosting period without significant penalty.

- It is feasible for the customer to either run the software on their own hardware or contract with another party unrelated to the vendor to host the software.

SaaS services don't satisfy those FASB criteria, as customers cannot take possession of the software during their subscription period, and it's not feasible for them to run the software on their own machines, by mutually accepted terms of service. (*See* https://www.profitwell.com/blog/how-revenue-recognition-works-in-saas). For accounting purposes, SaaS subscription revenues should initially be considered 'non-refundable up-front fees' and not recognized until, among other things, delivery has occurred or services have been rendered.

[5] In SaaS business the cost of performing the service is a fraction of the "Deferred Revenue" position, representing the marginal profit of operating the business. For the Debtor, the cost to operate the service for all of its customers amounted to approximately $5,000 per month (aka the hosting service fees).

with prejudice. Let me know if you would like to discuss or would like to examine the relevant records supporting the foregoing.

Sincerely,

Jose Raul Alcantar Villagran